UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------x

CARLOS C. JIMENEZ,                                  :

                                                    :
                                    Plaintiff,

                                                    :     **MEMORANDUM**
                        - against -                       **DECISION & ORDER**[*]

                                                    :
PATRICK R. DONAHOE, Postmaster General                   10 Civ. 3289 (FM)
of the United States Postal Service,                :

                                    Defendant.      :

----------------------------------------------------------x

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #: _____          │
│ DATE FILED:    9/11/13           │
└─────────────────────────────────┘
```

**FRANK MAAS**, United States Magistrate Judge.

Pro se plaintiff Carlos C. Jimenez ("Jimenez") is an employee of the United

States Postal Service ("USPS").  He brings this employment discrimination suit against

the Postmaster General under Title VII of the Civil Rights Act of 1964, 42 U.S.C.

§ 2000e, et seq. ("Title VII").  In his complaint ("Complaint" or "Compl."), Jimenez

claims that the USPS discriminated against him, based on his race and national origin and

in retaliation for his filing of earlier Equal Employment Opportunity ("EEO")

complaints.[1]  Specifically, Jimenez alleges that in violation of Title VII:  (1) on October

14, 2006, a USPS manager refused to allow him to be interviewed by the editor of an

_____

    [*]    Ryan Chabot, a student at Columbia Law School who served as a summer intern
in my Chambers, provided substantial assistance in the preparation of this Memorandum
Decision and Order.

    [1]    Citations to the Complaint refer to the paginated version included in the papers in
support of the Postmaster General's prior partial motion to dismiss.  (See ECF No. 22 (Decl. of
Ass't U.S. Att'y Kirti Vaidya Reddy, dated July 18, 2011) at Ex. A).

internal USPS magazine; (2) the USPS failed to remove from his personnel file records concerning two disciplinary actions; (3) his supervisors "constantly paged" him while he was using the restroom; (4) the USPS removed him from his regular weekend work section from December 2006 through June 2007 despite his seniority; (5) he was suspended for fourteen days in August 2007 without cause; (6) his medical documentation in support of a request for medical leave was rejected; and (7) a supervisor threatened and harassed him on August 6, 2007.  (See Compl. at 8-17).  In the course of discovery, Jimenez also suggested that he improperly was denied bereavement leave in 2010.  (See ECF No. 46 ("Def.'s Mem.") at 13).

Following the close of discovery, the Postmaster General has moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  (ECF No. 41).  For the reasons set forth below, that motion is granted and this case is dismissed.

I.     Background

A.     Relevant Facts

Jimenez is a Hispanic male of Puerto Rican descent, who began working for the USPS as a mail handler at its Westchester Processing and Distribution Center on December 6, 1997.  (Decl. of Ms. Reddy, dated Feb. 21, 2013 ("Reddy SJ Decl."), Ex. A (Tr. of Jimenez Dep. ("Tr.")) at 38-43; Decl. of Gwendolyn Edwards, dated Feb. 21, 2013 ("Edwards Decl."), ¶ 7).  As a mail handler, Jimenez sorts mail by zip code, either manually or mechanically.  (Edwards Decl. ¶ 7).  He began as a part-time USPS

employee, but now works full time, earning $51,000 per year.  (Tr. 51, 54).  In addition to

his work for the USPS, Jimenez is a member and manager of a band.  (Id. at 55).

On October 5, 2006, Jimenez received a favorable decision from an

arbitrator concerning a letter of warning issued to him in December 2005.  (Id. at 107; Ex.

L).[2]  Jimenez received the letter after fifteen instances of tardiness and absenteeism in late

2005 which he alleged were attributable to his son's illness.  The arbitrator found that

there was sufficient confusion concerning Jimenez's rights under the Family Medical

Leave Act ("FMLA") to warrant removal of the letter from his personnel file.  (Tr. 106-

08; Ex. E at 4).  After Jimenez filed a grievance concerning a second letter of warning

dated April 15, 2006, a different arbitrator rejected the request for its removal because

Jimenez had by then had sufficient time to learn the FMLA requirements regarding leave.

(Ex. E at 5).

On or about October 14, 2006, an editor of The District magazine, an

internal USPS publication for employees in the New York metropolitan area, scheduled

an interview with Jimenez concerning his non-work-related musical activities.  (Tr. 77-

81).  Jimenez alleges that after the interviewer arrived, but before the interview began,

Keith Fisher, a supervisor, forbade Jimenez's participation in the interview because of

Jimenez's prior EEO complaints.  (Id. at 81-82).  Fisher's approval was required because

the interview was to take place in a USPS human resources office and therefore would

take Jimenez away from his work.  (Id. at 89-91, 95-96).

---

[2]     Citations to "Ex." refer to the exhibits annexed to the Reddy SJ Decl.

On October 30, 2006, the USPS issued Jimenez a fourteen-day suspension. In a pre-arbitration settlement agreement dated May 7, 2007, the USPS and Jimenez's union agreed that the suspension would, instead, be served as a "seven-day paper suspension." The USPS did not agree, however, that any reference to the suspension would be removed from Jimenez's personnel file. (Ex. E at 6).[3]

Jimenez also contends that, beginning in December 2006, he constantly was paged by his supervisors while in the bathroom. (Tr. 152-55). As he explained during his deposition, "if they [didn't] see me for one second, right away they [would] page [me] . . . [e]very time I [went] to the bathroom." (Id. at 155). Jimenez does not allege that any of those supervisors ever commented on his race or national origin. (See id. at 158-59, 164, 168-69, 170-71).

During his employment with the USPS, Jimenez routinely was assigned to a particular work section on Saturdays and Sundays, along with four other permanent employees and some temporary workers. (Id. at 174). From December 2006 to June 2007, however, Mike D'Souza, his USPS supervisor at the time, reassigned him to a different weekend work section, in which he was required to transport mail and equipment. (Id. at 171, 179, 181; see Compl. at 13). Four other permanent employees with whom he had worked remained assigned to their prior work sections. All four, however, were more senior than Jimenez. (Tr. 175; see Compl. at 13-14). Jimenez

---

[3]    The Postmaster General contends that the suspension was for failure to be in regular attendance. (Def.'s Mem. at 7).

4

contends that D'Souza reassigned him without consulting with him because of his race and national origin and as retaliation for his prior EEO activity.  (Tr. 187-88).

On August 2, 2007, the USPS suspended Jimenez for fourteen days due to his failure to report to work or his lateness on six prior dates.  (Id. at 184-85, 193; Ex. N; see Ex. E).  On two of those dates, Jimenez had visited a doctor in connection with an upcoming trip to Ecuador.  (Tr. 203).  At the time of those visits, Jimenez knew that the proper procedure for requesting time off required him to sign a slip generated by the supervisor, but he alleges that he made an oral request for permission to his supervisor, Bobbi Shanks, who said she would "take care of it."  (Id. at 191-95).  Jimenez eventually provided his supervisor with a copy of a doctor's note.  In response to a later request from Shanks, he also provided the original.  (Id. at 202-03).  When he was asked how this incident related to his claim of racial or national origin discrimination, Jimenez testified that "they have to have a legitimate reason to ask you for the original" and, thus, "[i]t could probably be racial [that] after the fact . . . they asked for the original."  (Id. at 207).  Jimenez acknowledges that Shanks did not say or do anything that indicated that her request for the note or his suspension was in retaliation for his prior EEO activity.  (Id. at 209).  He evidently further concedes that the four other absences that the USPS relied upon as a basis for his suspension were unauthorized.[4]  (Ex. E at 8).

---

[4]      The USPS Employee and Labor Relations Manual requires that any leave request be approved in advance by a supervisor unless it arises out of an unexpected illness or injury. (Ex. B at 544).  A USPS employee may request leave by completing a USPS Form 3971, signing the form, and submitting it to a supervisor, or by asking a supervisor to generate the form.  (See id.; Edwards Decl. ¶ 9).

Jimenez also claims that he was harassed and threatened by supervisor Janice Garrett in August 2007.  (Id. at 213).  On that occasion, Garrett instructed him to bring certain empty items of equipment to a specified area, after which he "stood up to talk to George Martinez," another USPS employee, for "maybe two minutes."  (Id. at 214, 218-19).  While that conversation was underway, Garrett told Jimenez, "I need you to go back to work. . . . I need you to stop talking and start working."  (Id.).  After Jimenez protested that he had completed the assigned task, she allegedly responded, "I don't care. You need to bring more [of the equipment items].  Find them.  Look for them. . . . If you don't move it, I'm going to take action against you, write you up."  (Id. at 214).  Jimenez and Garrett then argued for approximately ten minutes.  (Id. at 215).  As Jimenez since has explained, Garrett "didn't like the fact that I was talking . . . with George Martinez" and used "her egotistical power as a supervisor[] to tell us to stop."  (Id. at 218).  He was unable to cite any facts, however, suggesting that Garrett's alleged harassment of him arose out of his race or national origin or prior EEO activity.  (Id. at 220-22).

On August 24, 2007, Jimenez filed an administrative complaint with the USPS Equal Employment Opportunity office alleging various Title VII violations.  (Ex. E at 2).  Thereafter, on February 13, 2007, the USPS issued a decision concluding that Jimenez had failed to prove employment discrimination.  (Ex. D).  Jimenez appealed that finding to the Equal Employment Opportunity Commission's Office of Federal Operations, which affirmed the USPS's decision on November 30, 2009.  (Ex. E).

On or about April 22, 2010, Jimenez submitted two "Request for Temporary Schedule Change for Personal Convenience" forms to the USPS.  (Ex. T).[5] After his grandfather died the following week, Jimenez sought further schedule changes, but he did not complete any additional forms regarding those changes.  (Tr. 274-77, 282-83).  As a consequence, the USPS concluded that Jimenez was "AWOL" on April 16, 2010.  (Ex. P).  Jimenez filed an appeal to the EEOC after the USPS rejected his EEO complaint concerning that determination.  (Reddy SJ Decl. ¶ 5).

On April 29, 2010, the USPS issued a notice of removal indicating its intent to terminate Jimenez's employment due to his AWOL status on April 16, 2010.  (Ex. P). The notice also cited other aspects of Jimenez's employment record, including his seven-day suspension in 2006, two fourteen-day suspensions in 2007 and 2009, and the 2006 letter of warning.  (Id.).

B.    Relevant Procedural History

On April 19, 2010, Jimenez commenced this suit against the Postmaster General and five USPS supervisors.  (See Compl. at 1).  Subsequently, on August 28, 2012, I dismissed Jimenez's claims against the supervisors because the head of the employing agency is the only proper defendant in a Title VII suit by a federal employee. See ECF No. 36 (citing 42 U.S.C. § 2000e-16(c); Mandell v. Cnty. of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003)).

---

[5]    The first form, for the period from April 10 through 16, 2010, bears a supervisor's signature, but neither the approved nor disapproved box is checked.  Although the form expressly requires that a reason be given if a request is disapproved, none is set forth.  (Id.).  The form for the second week, signed by the same supervisor, indicates that the request is approved. (Id.).

On February 22, 2013, the Postmaster General moved for summary judgment.  (ECF No. 41).  As required by Local Civil Rule 56.2, the Postmaster General gave Jimenez notice that he was required to submit admissible evidence in support of his claims or face their dismissal without a trial.  (ECF No. 47).  Despite that notice, Jimenez's response, filed on March 25, 2013, took the form of a two-paragraph letter expressing gratitude that his case was progressing, but suggesting that he could not respond to the Postmaster General's motion "without legal counseling."  (ECF No. 51).[6]

Previously, after Jimenez filed this suit, but before the filing of the summary judgment motion, Jimenez filed a new administrative complaint on June 14, 2010.  In that complaint, Jimenez alleged that the USPS had retaliated against him for his EEO activities by denying a bereavement leave claim in 2010.  (See Reddy SJ Decl. ¶ 5). As of the date the summary judgment motion was filed, that claim remained pending before the EEOC.  (Id.).

II.     Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and [he] is entitled to judgment as a matter of law" based on supporting materials in the record.  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'  A fact is material if it 'might affect the outcome of the suit under the governing law.'"  Roe

---

[6]        In early 2010, Jimenez sought the appointment of pro bono counsel.  (ECF No. 3). I denied that application on June 28, 2010, explaining that Jimenez had not yet shown that his case potentially had merit.  (ECF No. 5).

v. City of Waterbury, 542 F.3d 31, 35 (2d Cir. 2008) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)).

In deciding a motion for summary judgment, the Court must "view the evidence in the light most favorable to the party opposing summary judgment and must draw all permissible inferences" in favor of that party. Harris v. Provident Life & Acc. Ins. Co., 310 F.3d 73, 78 (2d Cir. 2002) (quoting Gummo v. Vill. of Depew, N.Y., 75 F.3d 98, 107 (2d Cir. 1996)). To defeat a properly supported motion for summary judgment, however, the non-moving party cannot simply rely upon allegations contained in the pleadings that raise no more than "some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the party opposing summary judgment must offer "concrete evidence from which a reasonable juror could return a verdict in his favor." Anderson, 477 U.S. at 256; see also FDIC v. Great Am. Ins. Co., 607 F.3d 288, 292 (2d Cir. 2010) (A non-moving party cannot simply rely on "conclusory allegations or unsubstantiated speculation.").

Assessments of credibility, choosing between conflicting versions of the events, and the weighing of evidence are matters for the jury, not for the Court. Fischl v. Armitage, 128 F.3d 50, 55 (2d Cir. 1997). Thus, "[t]he court's function is not to resolve disputed issues of fact but only to determine whether there is a genuine issue of material fact to be tried." Id.

The Second Circuit has "emphasized that trial courts must be especially chary in handing out summary judgment in discrimination cases, because in such cases

the employer's intent is ordinarily at issue."  Chertkova v. Conn. Gen. Life Ins. Co., 92

F.3d 81, 87 (2d Cir. 1996).  However, "[e]ven in the discrimination context, . . . a plaintiff

must provide more than conclusory allegations to resist a motion for summary judgment."

Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 101 (2d Cir. 2010).

III.    Applicable Law

        A.    Title VII Discrimination

        Title VII provides that "[i]t shall be an unlawful employment practice for an

employer . . . to discharge any individual, or otherwise to discriminate against any

individual with respect to his compensation, terms, conditions, or privileges of

employment, because of such individual's race, color, religion, sex, or national origin."

42 U.S.C. § 2000e-2(a)(1).

        To overcome a motion for summary judgment under Title VII, a

discrimination plaintiff must withstand the three-part burden-shifting laid out by

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973).  Under that rubric, the

plaintiff must satisfy an initial burden of "proving by the preponderance of the evidence a

prima facie case of discrimination."  Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S.

248, 252-53 (1981).  Accordingly, the plaintiff must show that:  (1) he was within the

protected class; (2) he was qualified for the position he held; (3) he was subjected to an

adverse employment decision or discharge; and (4) the adverse action occurred under

circumstances giving rise to an inference of discrimination.  See Reynolds v. Barrett, 685

F.3d 193, 202 (2d Cir. 2012); Stratton v. Dep't for the Aging, 132 F.3d 869, 879 (2d Cir.

1997).  "A plaintiff sustains an adverse employment action if he or she endures a materially adverse change in the terms and conditions of employment." Galabya v. N.Y. City Bd. of Educ., 202 F.3d 636, 640 (2d Cir. 2000) (internal quotation marks omitted). Among the actions that qualify as materially adverse are "a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, [and] significantly diminished material responsibilities." Id.

Once the plaintiff makes out a prima facie case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment decision." Sharpe v. MCI Commc'ns Servs., Inc., 684 F. Supp. 2d 394, 401 (S.D.N.Y. 2010) (quoting Stratton, 132 F.3d at 879).  The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." Felder v. Securitcus Sec. Servs., No. 04 Civ. 9501 (LAK), 2006 WL 2627969, at *7 (S.D.N.Y. Sept. 12, 2006) (quoting Fisher v. Vassar Coll., 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc)).

Finally, if the defendant provides a nondiscriminatory rationale for its conduct, the rebuttable presumption drops out of the case. St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510-11 (1993).  The burden then rests on the plaintiff to prove not only that the proffered nondiscriminatory reason was pretextual, but also that the defendant discriminated against the plaintiff. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 93-94 (2d Cir. 2001).  In other words, the burden shifts back to the plaintiff

to prove that "discrimination was the real reason for the employment action."  Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

　　　　　In most cases there is a significant overlap among the three steps in the McDonnell Douglas framework.  Indeed, the question of whether the plaintiff has met his prima facie burden of demonstrating an inference of discrimination is often indistinguishable from the question of whether the employer's actions served merely as a pretext for some disguised discriminatory animus towards the plaintiff.  See Goldman v. Admin. for Children's Servs., No. 04 Civ. 7890 (GEL), 2007 WL 1552397, at *5 (S.D.N.Y. May 29, 2007).  In the end, "the bottom line in a Title VII summary judgment motion is, simply, whether plaintiff has presented sufficient evidence from which a reasonable trier of fact could determine that defendants discriminated against her."  Id.; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) ("Although intermediate evidentiary burdens shift back and forth under [the McDonnell Douglas] framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (internal quotation marks omitted).

　　　　B.　　Retaliation

　　　　　Title VII also makes it unlawful for an employer to retaliate against an employee who has engaged in protected activity such as filing EEO complaints.  "To establish a prima facie case of unlawful retaliation under Title VII, an employee must show that (1) he was engaged in protected activity; (2) the employer was aware of that

activity; (3) the employee suffered a materially adverse action; and (4) there was a causal connection between the protected activity and that adverse action." Rivera v. Rochester Genesee Reg'l Transp. Auth., 702 F.3d 685, 698 (2d Cir. 2012) (internal quotation marks omitted). Although the plaintiff need not show that his underlying discrimination claim has merit, id. (citing Lore v. City of Syracuse, 670 F.3d 127, 157 (2d Cir. 2012)), a plaintiff claiming retaliation must show that the adverse action would not have occurred but for the employer's retaliatory intent. Univ. of Texas Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2533, 2534 (2013).

C.      Administrative Exhaustion

To pursue a Title VII claim in federal court, an employee ordinarily must first exhaust his administrative remedies. See Legnani v. Alitalia Linee Aeree Italiane, S.P.A., 274 F.3d 683, 684-86 (2d Cir. 2001). In a Title VII suit against a federal agency, the first step in the exhaustion process requires the employee to initiate contact with an agency EEO counselor "within 45 days of the date of the matter alleged to be discriminatory." See 29 C.F.R. § 1614.105(a)(1). Thereafter, before filing suit, the employee must complete the administrative process. See Miller v. Kempthorne, 357 F. App'x 384, 385 (2d Cir. 2009) (citing Briones v. Runyou, 101 F.3d 287, 289-90 (2d Cir. 1996)). The fact that the EEOC may issue a decision after the suit is filed cannot cure the premature filing of a suit. Tolbert v. United States, 916 F.2d 245, 249 (5th Cir. 1990); Williams v. Potter, No. 01 Civ. 332 (JGK), 2002 WL 32964463, at *4 (S.D.N.Y. Aug. 26, 2002).

13

IV.     Application of Law to Facts

    A.     Exhaustion

        In addition to the seven claims specifically raised in the Complaint, Jimenez

appears to argue that the USPS issued its notice of removal in 2010 in retaliation for his

prior EEO activities.  (See Def.'s Mem. at 13 (noting that Jimenez has "alluded to a claim

based on his request for bereavement leave through documents attached to various

filings" and his "discovery responses")).  This claim, however, is not set forth in his

Complaint, nor did he seek to amend his Complaint to include it.

        The Postmaster General first sought to dismiss this claim in his reply papers

regarding his motion to dismiss the Complaint.  (See ECF No. 36 at 10).  At that time, I

denied that application without prejudice because Jimenez had not been afforded any

opportunity to respond.  (Id.).  That concern obviously no longer exists.  Moreover,

because he has failed to respond to the Postmaster General's renewed application,

Jimenez, in effect, admits that he jumped the gun by not completing the administrative

process with respect to his bereavement leave claim before filing this suit.  (See Reddy SJ

Decl. ¶ 5; ECF No. 48 (Def.'s R. 56.1 Stmt.) ¶ 13).  Any claim arising out of his 2010

request for bereavement leave and the subsequent notice of removal therefore must be

dismissed without prejudice.

    B.     Timeliness

        As noted previously, a federal employee asserting a Title VII claim must

contact an agency counselor "within 45 days of the matter alleged to be discriminatory."

29 C.F.R. § 1614.105(a)(1).  In this case, Jimenez complains about his aborted interview with the editor of <u>The District</u> magazine on October 14, 2006, but he failed to bring the matter to the attention of an EEO counselor until June 12, 2007, some eight months later. (<u>See</u> Ex. E at 2).  Although the 45-day period is subject to equitable tolling, <u>see</u> <u>Bruce v. U.S. Dep't of Justice</u>, 314 F.3d 71, 74 (2d Cir. 2002), Jimenez's only explanation for the delay is that he initially "didn't take it as personal."  (Tr. 104).  The fact that subsequent events may have caused him to change his view plainly is not a basis for equitable tolling, which is appropriate only in rare and exceptional circumstances in which a claimant has been prevented from exercising his rights in some extraordinary way.  <u>Zerilli-Edelglass v. N.Y.C. Transit Auth.</u>, 333 F.3d 74, 80-81 (2d Cir. 2003) (quoting <u>Smith v. McGinnis</u>, 208 F.3d 13, 17 (2d Cir. 2000); <u>Johnson v. Nyack Hosp.</u>, 86 F.3d 8, 12 (2d Cir. 1996)). Accordingly, the Postmaster General is entitled to summary judgment with respect to Jimenez's interview claim.[7]

     C.    <u>Remaining Claims</u>

     1.    <u>Race and National Origin Discrimination</u>

To establish a <u>prima</u> <u>facie</u> Title VII discrimination claim, Jimenez must prove four elements:  (a) membership in a protected class; (b) his qualification for his position; (c) an adverse employment action; and (d) circumstances suggesting the adverse

---

[7]     In any event, even if Jimenez had timely contacted an EEO counselor, the proposed interview related to Jimenez's alternative career as a musician, not the terms or conditions of his employment at the USPS.  Accordingly, any wrong that may have occurred did not affect a "privilege of employment" that is entitled to protection under Title VII.  <u>See</u> 42 U.S.C. § 2000e-2(a).

action occurred due to discrimination.  See Reynolds, 685 F.3d at 202.  Here, the USPS

does not dispute that Jimenez is a member of a protected class who is qualified for the

position he holds.  (See Def.'s Mem. at 3).  The USPS nevertheless maintains that

Jimenez has failed to establish that he was subjected to an adverse employment action

under circumstances that give rise to an inference of discrimination.  Although the burden

at the initial stage of the McDonnell Douglas analysis is "minimal," Scaria v. Rub, 117

F.3d 652, 654 (2d Cir. 1997), Jimenez must adduce some evidence to support these latter

elements of his prima facie discrimination claims to avoid summary judgment.  He has

not satisfied that burden.

> a.    Adverse Employment Action

"A plaintiff sustains an adverse employment action if he or she endures a

materially adverse change in the terms and conditions of employment."  Galabya, 202

F.3d at 640 (citing Richardson v. N.Y.S. Dep't of Correctional Servs., 180 F.3d 426, 446

(2d Cir. 1999) (internal quotation marks omitted)).  To be "materially adverse," the

change must be "more disruptive than a mere inconvenience or an alteration of job

responsibilities."  Id. (quoting Crady v. Liberty Nat'l Bank and Trust Co., 993 F.2d 132,

136 (7th Cir. 1993)).  Examples of materially adverse changes include "a termination of

employment, a demotion evidenced by a decrease in wage or salary, a less distinguished

title, a material loss of benefits, significantly diminished material responsibilities, or other

indices . . . unique to a particular situation."  Id. (quoting Crady, 993 F.2d  at 136).

Several of Jimenez's allegations involve circumstances that do not constitute materially adverse changes in the terms and conditions of his employment. For example, Jimenez complains about his reassignment from particular weekend work sections for a period of months. (See Compl. at 13). Notably, it does not appear that his work hours changed; he simply was required to perform other work that was less to his liking. However, a plaintiff's "subjective dissatisfaction with assignments does not constitute adverse employment action." Harrison v. N.Y.C. Off-Track Betting Corp., No. 99 Civ. 6075 (VM), 2001 WL 1154691, at *3 (S.D.N.Y. Sept. 28, 2001); accord Gelin v. Geithner, No. 06 Civ. 10176 (KMK), 2009 WL 804144, at *11 (S.D.N.Y. Mar. 26, 2009). Jimenez's reassignment to a different work section therefore does not give rise to a Title VII violation.

Similarly, Jimenez complains about harassment by supervisor Garrett on a single occasion in 2007. The Second Circuit has recognized that a single "extraordinarily severe" event may alter the conditions of an employee's working environment and therefore constitute a materially adverse action. Mathirampuzha v. Potter, 548 F.3d 70, 78-79 (2d Cir. 2008). Thus, a worksite rape in a suit alleging sex-based discrimination clearly would qualify. Id. (citing Ferris v. Delta Air Lines, Inc., 277 F.3d 128, 136 (2d Cir. 2001)). To be actionable, however, the single incident must give rise to an "intolerable alteration of the plaintiff's working conditions" that "substantially interfere[s] with or impair[s] his ability to do his job." Id. at 79 (internal citation and quotation marks omitted). A directive that an employee return to his work, no matter how

17

harshly delivered, is not the sort of extraordinary event that could fairly be characterized as a materially adverse employment action.  Jimenez's harassment claim arising out of his interaction with Garrett in 2007 consequently fails to state a <u>prima</u> <u>facie</u> claim of discrimination or retaliation.

> b.   <u>Discriminatory Intent</u>

Assuming that one or more of the remaining actions about which Jimenez complains qualify as adverse employment actions, Jimenez still would have to prove that they were taken under circumstances giving rise to an inference of discrimination to make out a <u>prima</u> <u>facie</u> case of race or national origin discrimination.  <u>Reynolds</u>, 685 F.3d at 202.  During his deposition, Jimenez was given several opportunities to cite an evidentiary basis for his belief that he was a victim of unlawful discrimination, but was unable to do so.  For example, when he was asked whether Garrett had done or said anything that led him to believe that her directive to return to work was based on his race or national origin, Jimenez responded as follows:

> None of the supervisors will ever put themselves in a position where they, you know, they can get written up for something that they say.  Like who is going to say, you know, "I don't like you because your [sic] Latino."  Who is going to say that?  So they do little things that go – that make[] you feel that way.  But words, it's impossible for them to say something like that.  Even if they say it, will I be able to prove it?

(Tr. 221).  Similarly, when he was asked whether the allegedly constant paging had a discriminatory motive, Jimenez testified:

> I can't really be sure of that.  I have to find out once this case
> is being reviewed by the court.  That's something that I'm not
> a professional attorney or I don't know, you know.  I can't
> really say.  That's what I feel.

(Id. at 164).

Speculation, however, is not a substitute for admissible evidence.

Consequently, to the extent that Jimenez alleges discrimination on the basis of his race or

national origin, even if he were able to show that he suffered an adverse employment

action, he has failed to establish a prima facie case.  Furthermore, because Jimenez has

failed to make the required prima facie showing, the Court need not consider whether the

USPS had a legitimate, non-discriminatory basis for its employment decisions.

In sum, the Postmaster General therefore is entitled to summary judgment

with respect to Jimenez's discrimination claims.

2.    Retaliation

Of the six claims asserted by Jimenez that are both timely and exhausted,

only four potentially rise to the level of an adverse employment action:  Jimenez's

assertions that the USPS:  (a) paged him every time he went to the bathroom; (b) failed to

remove certain disciplinary actions from his personnel file; (c) wrongfully rejected his

medical documentation; and (d) suspended him for fourteen days in 2007 without cause.

None of these actions, however, has been shown to be causally related to Jimenez's

protected EEO activity.

Turning first to the paging claim, Jimenez contends that his supervisors' harassment continued for at least six months and possibly as long as a year.  (Tr. 153). The EEOC suggests that this was a mere inconvenience, but if he in fact was paged every time he went to the bathroom (itself a dubious proposition), a finder of fact could conceivably find that this constituted an adverse employment action.  Nonetheless, when Jimenez was asked whether any of his supervisors ever did or said anything to suggest that the paging arose out his EEO activity, he responded, "No."  (Id. at 169).  In light of this concession, and in the absence of any showing of a temporal connection between Jimenez's EEO activity and the paging, Jimenez has not established the required causation element of his prima facie paging retaliation claim.

The second potential retaliation claim relates to the contents of Jimenez's personnel file.  Although an arbitrator concluded that the USPS's December 2005 letter of warning should be removed from his personnel file, a different arbitrator rejected Jimenez's request to remove a second such warning letter.  (Ex. E at 5).  Since the rationale for the removal of the first letter – confusion on Jimenez's part concerning the FMLA – was no longer applicable by the time that the USPS issued its second warning letter, the USPS was well within its rights not to remove the second letter.  Similarly, although Jimenez and his union were able to negotiate a seven-day "paper suspension" in lieu of a fourteen-day suspension in October 2006, nothing in the settlement agreement required that any reference to the modified suspension be removed from his file.  (Id. at 6).  In these circumstances, Jimenez cannot show, as he must, that the USPS would have

removed the writings reflecting its discipline of him but for his exercise of his rights under Title VII.  See Nassar, 133 S. Ct. at 2534.

Jimenez's medical documentation retaliation claim is no more meritorious. In August 2007, Jimenez was suspended for fourteen days based on his unauthorized absence from work.  He later sought to tender to supervisor Shanks a copy (and eventually the original) of a doctor's note that explained that two of the six absences were attributable to a trip to Ecuador that Jimenez intended to take.  (Tr. 203).  As Shanks later explained, however, when an employee, such as Jimenez, requests advance sick leave, she requires that the employee tender medical documentation prior to approval – not after the fact.  (Ex. E at 9).  If so, there was no reason for Shanks or the USPS to accept Jimenez's documentation retroactively.  In any event, when Jimenez was asked whether Shanks had said or done anything suggesting that her refusal to accept the documentation "was in retaliation for [his] prior EEO activity," he responded, "How can I say?  I don't know."  (Tr. 209).  His speculation that there might have been such a reason does not satisfy the causal connection element of a prima facie retaliation claim, much less show that his leave paperwork would have been accepted retroactively, but for his EEO activity.

Finally, the USPS suspended Jimenez for fourteen days in August 2007 based on his six unexcused absences in 2007, as well as his prior paper suspension and letter of warning in April 2006.  (Ex. N).  The 2007 suspension was issued by supervisor Cassandra Coy at the behest of Shanks.  (Id. at 98).  Since both Shanks and Coy also

disciplined other USPS employees for "failing to be regular in attendance" during the same approximate time period, (see Ex. C at 176), there is no reason to believe that Jimenez's suspension would not have occurred but for his prior EEO activity.  He therefore has failed to make a prima facie showing with respect to the causal connection requirement of this retaliation claim.

   In sum, several of the events about which Jimenez complains do not constitute adverse actions.  Additionally, with respect to the remaining allegedly objectionable conduct, Jimenez has failed to establish a prima facie case of "but for" causation.  The Postmaster General therefore is entitled to summary judgment on Jimenez's retaliation claims.

V.  Conclusion

   For the reasons above, the Postmaster General's motion for summary judgment, (ECF No. 41), is granted and this case is dismissed.  The Court further certifies pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Memorandum Decision and Order would not be taken in good faith; in forma pauperis status therefore is denied for purposes of any appeal.  See Coppedge v. United States, 369 U.S. 438, 444-45 (1962).

   SO ORDERED.

Dated:  New York, New York
    September 10, 2013

              FRANK MAAS
          United States Magistrate Judge

Copies to:

Carlos Jimenez
Plaintiff Pro Se
115 Tibbetts Road, Apt. 3C
Yonkers, New York 10705

Defense Counsel via ECF